## Case No. 8,105.

### In re LATHROP et al.

[3 N. B. R. 46 (Quarto, 11); [1] 2 Am. Law T. 124.]

District Court, S. D. New York. July, 1869.

BANKRUPTCY—WITHDRAWAL OF COUNSEL—EFFECT OF DEFAULT UPON DISCHARGE.

In this case Mr. Da Costa, on behalf of petitioning creditors, moved for an adjudication of bankruptcy.

Augustus F. Smith appeared for the debtors, Messrs. Lathrop, Ludington & Co. The question presented was, as to whether, in case he should withdraw his appearance, and suffer a default to be taken against his clients, all the allegations in the petition should be taken as true in subsequent proceedings for their discharge, and THE COURT [BLATCHFORD, District Judge] decided that question in the negative, to the effect that the debtors would not be prejudiced in their application for a discharge by submitting to such default.

---

## Case No. 8,106.

### In re LATHROP et al.

[4 N. B. R. 93.] [2]

District Court, S. D. New York. Nov. 16, 1870.

PRACTICE IN BANKRUPTCY—EXAMINATION OF WITNESS BEFORE REGISTER—REFUSAL TO ANSWER.

Where witness, who purchased claims against a bankrupt's estate, refused by the advice of his counsel to answer questions (or evaded a direct answer thereto), relative to the money or consideration used in the purchase thereof, from whom and how he obtained the same, otherwise than from the bankrupts, the witness testifying that he had not obtained the same from the bankrupts or either of them, held, that he must answer the same, and this decision was certified to the register who took the testimony and certified it up to the court that a motion to punish for contempt might be made thereon.

[Cited in Re Krueger, Case No. 7,942.]

[In the matter of Robert Lathrop, Daniel Cady, and Samuel Burtis, partners as Lathrop, Cady & Burtis, bankrupts. The district court sent the case to the register to make report as to the rejection of certain claims against the bankrupt filed by C. D. Prescott. Case No. 8,103. The case is now first heard by the register upon the examination of Prescott, and second by the court upon the certificate of the register of refusal to answer.]

Cyrus D. Prescott, of Rome, in the county of Oneida and state of New York, being duly sworn and examined at the time and place above mentioned, upon his oath, says: Q. 1.—Was there any, and if so what bargain or agreement, express or implied, made or entered into between you and H. W. Belcher & Co. previous to their making proof in bankruptcy of their claim against these bankrupts, to transfer or dispose of the said claim or any part thereof? (Objected to the above and following questions as leading.) A.—There was none. Q. 2.—Was there any, and if so what bargain or agreement, express or implied, made or entered into between you and T. B. Peddie & Co., previous to their making proof in bankruptcy of their claim against these bankrupts, to transfer or dispose of the said claim or any part thereof? A.—There was none. Q. 3.—Was there any, and if so what bargain or agreement, express or implied, made or entered into between yourself and John R. Church, previous to his making proof in bankruptcy of the claim against these bankrupts, to transfer or dispose of the said claim or any part thereof? A.—There was none. Q. 4.—When, for the first time, was any offer made by you to purchase his claim? A.—Not till after it was proved in bankruptcy by William E. Church. Q. 5.—When did you buy the claim of Moseby and Tynberg? A.—About the 24th March, 1868, and after the adjudication of bankruptcy. It consisted of a note and balance of an account, the balance of the account was assigned and note transferred. Q. 6.—Were you personally present with Mr. Crowell, the president of the Phoenix Ins. Co., at the time you purchased their claim of the company? A.—I was. Q. 7.—Who else was present? A.—N. W. Burtis. Q. 8.—How many interviews did you have with Mr. Crowell? A.—Two at least. Q. 9.—Was the assignment of their claim to you in writing? A.—Yes, sir. Q. 10.—Who delivered the assignment to you? A.—I think Mr. Crowell, it might have been the vice-president. Q. 11.—Did you hear the conversation between N. W. Burtis and Crowell in regard to your purchasing this claim? A.—I did. Q. 12.—Have you read the examination of Crowell as to this conversation? A.—Yes, sir. Q. 13.—Was there anything said during these negotiations by N. W. Burtis to Crowell, or by any one else to Crowell, in regard to saving anything for the firm of L. C. & B., or of Samuel E. Burtis, one of the members of the firm? A.—There was nothing of that sort said. Q. 14.—Was there any, and if so what bargain or agreement, express or implied, entered into between you and Willister Knight & Co., previous to their making proof in bankruptcy of their claim against these bankrupts, to transfer or dispose of their said claim or any part thereof? A.—There was none. Q. 15.—Before this claim was proved in bankruptcy did you give anything whatever or agree to give anything whatever for this claim? A.—I did not. Q. 16.—Was there ever to your knowledge any power of attorney to you to represent this claim? A.—There was none. Q. 17.—At what date did you purchase this claim, and was the assignment of it in writing? A.—The assignment is in writing, I don't remember the date, it was subsequent to the adjudication in bankruptcy. Q. 18.—Was there any,

---

[1] [Reprinted from 3 N. B. R. 46 (Quarto 11), by permission.]

[2] [Reprinted by permission.]

and if so, what bargain or agreement, express or implied, made or entered into between you and T. H. Bates & Co., previous to their making proof in bankruptcy of their claims against these bankrupts, to transfer or dispose of the said claim or any part thereof? A.—There was none. Q. 19.—What amount of claims proved against the estate of Lathrop, Cady & Burtis, in bankruptcy, do you own and hold, without reckoning interest? A.—$103,409.84. (Objection against counsel handing papers to witness from which to testify.) Q. 20.—What amount of claims proved against estate of Daniel Cady individually in bankruptcy do you now hold, without interest? A.—$628. Q. 21.—Are there any other claims proved in bankruptcy against him individually? (Objected to that the record should be produced.) A.—There are none. Q. 22.—What debts are there outstanding against the estate in bankruptcy of L. C. & B., except these owned and held by you stated above? A.—Claims owned and held by Dexter A. Hawkins $1,614; four other claims amounting in all to $231.80. Total, $1,845.80, that's all. Q. 23.—What was the actual cost in cash to you of all the claims against the estate of the bankrupts, purchased and owned and held by you, without interest? A.—$62,315.81. Q. 24.—What is the interest on the said cost, from the respective dates of the purchase of each claim up to Nov. 1st, 1870, at 7 per cent? (Same objection as to counsel showing witness papers to apply to all these answers and questions.) A.—$9,630.05. Q. 25.—What amount of time have you necessarily expended in and about the purchasing of these claims? A.—Over one year. Q. 26.—What would be, in your opinion, an entirely reasonable and moderate compensation for your said time and services, expended in the purchase of these claims? (Objected to as immaterial.) A.—$5,000. Q. 27.—In purchasing these claims were you acting for or employed by the bankrupts, or either of them, and if so, which? A.—I was not acting or employed by either of them.

Examination of C. D. Prescott, continued: Q. 28.—State if you know what has become of the claims against Lathrop. Cady & Burtis outstanding at the date of their bankruptcy on which the creditors held collaterals? A.—They have been paid in full by collections of the collaterals. (Counsel for Cady & Burtis offers in evidence proofs in this bankruptcy of the claim of T. B. Peddie and of the claim of H. W. Belcher & Co., and of the claims of Willister Knight & Co., and of the claim of T. H. Bates & Co., and of the claim of the Phoenix Ins. Co. The said proofs being on the files of the court. Objected to on the ground that the papers are not produced, and it does not appear that the papers are on the files of the court.)

Cross-examined by counsel for Robt. Lathrop: Q. 29.—Mr. Prescott, in your direct examination you say that you own and hold claims proved in bankruptcy against the estate of L. C. & B., to the amount of $103,-409.84. Will you specify these claims? A.—I cannot give you the list now, but will prepare one and furnish it to-morrow. Q. 30.—Will you state from which of these parties you received the powers of attorney? A.—I will name them on the same list. I will furnish it to-morrow. Q. 31.—In your direct examination you say you have paid out in cash for these claims $62,315.81. Has any portion of this been returned or repaid to you in any manner, either directly or indirectly? A.—It has not. Q. 32.—Did you buy these claims personally or through other parties? A.—Both. Q. 33.—State through whom? A.—Dexter A. Hawkins purchased some for me, and Burtis and French the same, a broker by the name of Odell, I think, and I think there were two other brokers, but I don't recall their names; that's all I remember now. Q. 34.—What claims did Dexter A. Hawkins buy for you? A.—I will give what I remember of them, L. J. & J. Phillips, I think, John E. Kohlsast, E. Behrend, Storrs Bros. These are all I now recall distinctly. Q. 35.—Have you any means of ascertaining? A.—I don't know that I have, except from Mr. Hawkins. Q. 36.—Have you any memorandum of payment made to Mr. Hawkins for these claims? A.—I cannot state, I do not recall any. I don't remember whether I made any memorandum of it or not. Q. 37.—What claims did Burtis & French buy for you? A.—The claim of Moseby & Tynberg, two or three other notes and matters of account of which I can't recall the names. Q. 38.—To what amount about of claims? A.—I should think from $1,000 to $1,200 as near as I could state it now. Q. 39.—What did they pay for them, about? A.—Fifty cents on a dollar of the amount of the claims they bought. Q. 40.—Did you advance the money, and if so, when and how? A.—I did, and cannot tell whether cash or check, at or about the time of the purchase. Q. 41.—Can you fix the exact time in any way? A.—I don't know that I have any memorandum in regards to them. Q. 42.—Did you make any entry of it? A.—I have no recollection in regard thereto. Q. 43.—Did you hand them the checks or the money personally? A.—I did. Q. 44.—At one time or at different? A.—At different times. Q. 45.—Where is the paper now that they bought up for you? A.—It may be in my proofs of claims in bankruptcy against the estate of L. C. & B., and may be in my possession, some is annexed to the proofs and some of it I have. Q. 46.—Where is that which is in your possession? A.—I cannot tell whether here or at Rome. Q. 47.—If it is here, where is it? A.—At Mr. Hawkins' office. Q. 48.—When did you last see it? A.—The last I remember seeing them was about the time of the proceedings in the Semner matter. It was probably the Spring of 1869. Q. 49.—What claims did Odell buy for you? A.—I cannot now tell. Q. 50.—

Can you tell any of them? A.—My impression is a note or notes held by Hewitt & Ityerson was one, and there were others I do not recall. Q. 51.—Did he not buy Tilden's? A.—I think he did, and others, I don't remember whose they were. Q. 52.—Where did you get the money used in the purchase of these claims? I now refer to all the claims. (Objected to by counsel as a matter not in any way pertinent to the issues under consideration, and that the extreme limit of inquiry on this subject would be as to whether he obtained the money or any part of it from the estate of bankrupts, or from the bankrupts.) A.—They were not purchased with money of the bankrupts, or either of them, or their estate. I did use money received upon collaterals held by me upon an indebtedness of the firm to me, prior to their bankruptcy, to the extent of the indebtedness; but this was my money. (The first part of the answer objected to as not responsive.) Q. 53.—To what amount did you receive money on these collaterals? A.—I cannot state. Q. 54.—About how much? A.—I have rendered an account of the collections to the assignees in bankruptcy, and have no distinct recollections of the amount except that it was sufficient to pay the original debt. Q. 55.—What was the original amount of this debt? A.—About $10,000. I think a little over that amount. Q. 56.—Was this the same indebtedness testified to by you before Register Dwight in the matter of the American Manufacturing Company? A.—I did testify in relation to it in that proceeding. Q. 57.—Did you use any other moneys except what you received upon these collaterals? A.—Yes, sir. Q. 58.—Where did you get it? (Objected to. Beyond the enquiry as to whether it came from the bankrupts or their estate, it is irrelevant, impertinent, improper, not connected with any of the issues in this proceeding.) A.—Not from the bankrupts, or either of them, or their estate. (Objected to as not responsive.) Q. 59.—Where did you get it? (By advice of counsel witness declines to answer the question farther than he has already answered it, for the reasons stated in the objections to the same question before.) Q. 60.—Did you receive any part of it through N. W. Burtis, either directly or indirectly? (Same objection as before, also that N. W. Burtis is not a member of the firm of L. C. & B. the bankrupts, or in any way connected with the firm. Under advice of counsel, witness declines to answer for the same reasons before stated.) Q. 61.—Did you receive any part of it through Burtis & French, directly or indirectly? (Same objection as before, and under advice of counsel witness declines to answer for the same reasons before stated.) Q. 62.—Did you receive any part of it through Samuel W. Burtis? (Same objection, and that S. W. Burtis is not a member of the firm of L. C. & B. the bankrupts, or in any way connected with the firm,

and under the advice of counsel, witness declines to answer for same reasons as before stated.) Q. 63.—Did you receive any part of it from Dexter A. Hawkins? (Same objection, and under the advice of counsel the witness declines to answer for the same reasons as before stated.) Q. 64.—Has any part of it been raised upon or by means of any paper bearing the name of Lathrop, Cady & Burtis? A.—Not unless it was business paper issued by them in the regular course of their business before their bankruptcy, and then outstanding and unpaid, and purchased by me of third parties holding the same, and in no other way. (Objected to as not responsive, and further objected to counsel dictating to witness how he shall answer.) Q. 65.—Did you personally raise any part of that money upon such paper? (Objected to same ground as before, and as irrelevant and impertinent, inquiring into matters that have nothing to do with the issues before the court, and under advice of counsel for the same reasons as before stated, witness declines to answer further.) Q. 66.—Did not N. W. Burtis raise money for you upon such paper as you mention? (Same objection, and under advice of counsel witness declines to answer for the same reasons before stated.) Q. 67.—With the exceptions of the money raised from collaterals held as security for the $10,000 loan mentioned by you, did you not borrow the money used by you in the purchase of these claims? (Objected to as irrelevant, impertinent, and not connected with any of the matters in issue. Witness under advice of counsel declined to answer for reasons before stated.) Q. 68.—Are you not still indebted for money so borrowed? (Same objection, witness under advice of counsel for reasons before stated declines to answer.) Q. 69.—Have you paid any interest on money borrowed as stated in above question? (Same objection. Witness under the advice of counsel for reasons before stated declines to answer.) Q. 70.—Have you paid any part of the principal of the money so borrowed as stated in above question? (Same objection. Witness under advice of counsel declines to answer for reasons before stated.)

By the Register:

I, Henry Wilder Allen, register in bankruptcy of said district, the referee appointed by the court in the above entitled matter to take proof as to the matters set forth in the petition of Robert Lathrop, verified December 13th, 1869, and the answers thereto of Samuel E. Burtis, Daniel Cady, Dexter A. Hawkins, and Cyrus D. Prescott, do hereby certify that the foregoing is a true copy of the testimony of the witness, Cyrus D. Prescott, taken before me, and a true record of the proceedings before me in the above entitled matter, on the 2d and 3d days of November, A. D. 1870. And I do further certify, that the said witness, under the advice of counsel, refused to answer questions 59 to

70 inclusive, as appears by the foregoing record, and that at the request of the counsel for the petitioner, Robert Lathrop, I certify and transmit the testimony of said Prescott to the court that a motion to punish for contempt may be made thereon.

BLATCHFORD, District Judge. The witness must answer the questions 59 to 70 inclusive. The clerk will certify this decision to the register, Henry Wilder Allen, Esq.

[For a decision of the points in issue in the principal case, see Case No. 8,104.]

---

## Case No. 8,107.

### In re LATHROP.

[See Case No. 8,106.]

---

## Case No. 8,108.

### LATHROP v. BROWN.

[1 Woods 474; [1] 10 Am. Law Reg. (N. S.) 638; 6 Am. Law Rev. 367.]

Circuit Court, S. D. Georgia. April Term, 1871.

CONSTITUTIONAL LAW—IMPAIRING OBLIGATION OF CONTRACT—TAX ON DEBTS OR CONTRACTS OWNED OUT OF STATE — TAXES PAID CONDITION PRECEDENT TO MAINTAINING SUIT.

The act of the legislature of Georgia, approved October 13, 1870 [Laws Ga. 1870, p. 401], which provided that in all suits brought in any court of the state, founded on any debt or contract made before June 1, 1865, or in renewal thereof, the plaintiff should not have verdict or judgment unless the court was satisfied that all taxes upon said debt or contract had been paid for each year since the incurring or making thereof, and that in every trial upon such debt or contract, the fact that the same had been legally returned for taxes, and the taxes paid thereon, should be a condition precedent to a recovery; impairs the obligation of contracts and is therefore unconstitutional and void.

[Cited in Baldwin v. Buswell, 52 Vt. 60.]

This cause was tried upon demurrer to a plea in bar.

Edward J. Harden, for plaintiff.

Frank S. Hesseltine, for defendant.

BRADLEY, Circuit Justice. This is an action brought by Harvey W. Lathrop, a citizen of Maryland, against David M. Brown, upon a promissory note dated January 1, 1862, whereby one Jacob L. Riley, as principal, and Brown as surety, promised by the first of January then next to pay to John W. McLeod, or bearer, $2,280.50 for value received. Two thousand dollars were paid on the note December 8, 1865. The suit is brought for the balance. The defendant, amongst other things, pleads that the contract was made prior to the 1st of June, 1865, and that by a statute of Georgia, of the 13th of October, 1870, it was enacted that in all suits brought

in or before any court of the state, founded on any debt or contract made before the 1st of June, 1865, or in renewal thereof, it should not be lawful for the plaintiff to have a verdict or judgment in his favor until he had made it clear to the tribunal trying the same, that all legal taxes chargeable by law upon the same had been duly paid for each year since the making of said debt or contract. And further: In every trial upon a suit founded upon any such contract, it is provided that said debt has been legally given in for taxes, and the taxes paid shall be a condition precedent to a recovery on the same; and in every such case, if the tribunal trying is not clearly satisfied that said taxes have been duly given in and paid, it shall so find; and said suit shall be dismissed; and defendant avers that the causes of action in the declaration mentioned were chargeable with taxes, which have not been given in or paid.

The plaintiff demurs to this plea. The question is, whether said statute is constitutional, and I am clearly of the opinion that it is not. It imposes upon the plaintiff conditions for a recovery which were not required to be performed when the contract was made—conditions onerous, and if he has not paid the taxes, impossible to be performed. It imposes a penalty and forfeiture for nonpayment of taxes, which it is conceded did not exist when the taxes were assessed and payable. It therefore [not only] [3] impairs the validity of contracts [but is an ex post facto law].[3] Restrictions on the remedy which materially affect a contract tend as much to impair its validity as laws passed to abrogate it. They differ only in degree. I have no hesitation or doubt on the subject.

Judgment for plaintiff.

---

LATHROP (CRAFT v.). See Case No. 3,318.

---

## Case No. 8,109.

### LATHROP v. DRAKE et al.

[30 Leg. Int. 141.] [1]

Circuit Court, E. D. Pennsylvania. 1873.[2]

BANKRUPTCY — SUIT BY ASSIGNEE OUT OF DISTRICT ADJUDGING THE BANKRUPTCY—JURISDICTION.

A circuit court of the United States has no jurisdiction of a suit by an assignee in bankruptcy appointed in another district of the same or another state, to recover the amount of a preference obtained by a creditor, through judgment and execution in a state court. The jurisdiction is vested exclusively in the district courts of the same or any other district.

Plaintiff, assignee of Adams, brought this bill for an account, &c., against defendants, to recover an alleged preference under the bankrupt act [of 1867 (14 Stat. 517)]. The defendants, residents of Easton, in the East-

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

[3] [From 10 Am. Law. Reg. 638.]
[1] [Reprinted by permission.]
[2] [Reversed in 91 U. S. 516.]